
Serpe
+Ryan

## SENTENCING SUBMISSION

December 2, 2013

Hon. Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square, Room 2202
New York, NY 10007

Re: *United States v. William Barbalat*, 13 Crim. 268 (JMF)

Dear Judge Furman,

We represent William Barbalat ("Mr. Barbalat"), the above named defendant, and submit this letter on his behalf in anticipation of sentencing, which is currently scheduled for December 16, 2013. Mr. Barbalat pleaded guilty to interstate travel in aid of an unlawful activity, a violation of 18 U.S.C. §1952(a)(1) and (3).

Mr. Barbalat is a hard worker, a loyal friend, and a loving 42-year-old father. His offense represents an error in judgment coming on the heels of the collapse of a thriving career in computer engineering and technology after the economy crashed in 2008. Mr. Barbalat deeply regrets his actions. He has already suffered severe consequences as a result of his offense – in addition to a life-long felony conviction, he faces a $150,000 forfeiture judgment, and his reputation has been significantly tarnished by the coverage of this case in the press, which wrongly associates him with the Russian mob. For these and the additional reasons set forth below, we respectfully request that Your Honor sentence Mr. Barbalat to a term of probation without home confinement.

**I. Procedural History**

Mr. Barbalat was charged in two counts in the above indictment and arrested on April 15, 2013. On August 14, 2013, pursuant to a written agreement with the Government dated August 7, he pleaded guilty to Count 25 of the indictment, a violation of 18 U.S.C. §1952(a)(1) and (3). Sentencing is currently scheduled for December 16, 2013.

**II. Sentencing Guidelines & Sentencing Standard**

Section 2E1.2 of the Sentencing Guidelines applies to a violation of the Travel Act, 18 U.S.C. §1952. According to that section, the base offense level is the greater of six or the offense level applicable to the underlying offense. Also, "[i]f the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used." Sentencing Guidelines, § 2E1.2, Application Note 2. Here, Mr. Barbalat ran an illegal poker business, which is a violation of New York Penal Law Section 225.05, and the analogous federal offense is 18 U.S.C. § 1955, the Illegal Gambling Business Act ("IGBA"). The Sentencing Guidelines section that is applicable to the IGBA is 2E3.1. Pursuant to that section, Mr. Barbalat has a base offense level of 12. Because Mr. Barbalat has fully accepted responsibility for his actions, he is entitled to a two-level reduction. Thus, pursuant to the Sentencing Guidelines, Mr. Barbalat has a total offense level of 10, and a Criminal History Category of I. Accordingly, the advisory Sentencing Guidelines range is 6 to 12 months (Zone B).

A sentencing court must consider not only the advisory Sentencing Guidelines range, but also the sentencing factors set forth in 18 U.S.C. § 3553(a). The overarching mandate of 18 U.S.C. § 3553(a) is to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in Section 3553(a)(2). *See Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007); *U.S. v. Corsey*, 723 F.3d 366, 376 (2d Cir. 2013) (remanding

2

for resentencing where district court "gave only a passing mention to any of the section 3553(a) factors").

Below, we discuss each of the applicable Section 3553(a) considerations, and respectfully submit that, on balance, the purposes of sentencing will be met by a non-custodial sentence.

### III. 18 U.S.C. § 3553 Factors

#### A.    Mr. Barbalat's Personal History & Characteristics

A non-custodial sentence is appropriate in this case given Mr. Barbalat's personal history and good character, as detailed below. Mr. Barbalat is a responsible and loving son, a doting new father, and a loyal friend who always finds time to help others. Following the birth of his daughter and professional counseling, Mr. Barbalat has matured, and he will not exercise poor judgment again in the future. He has a job here in the U.S., and a great job prospect waiting for him in Mexico. He is deeply remorseful for his actions, and he has paid and will continue to pay dearly for his offense.

#### *1.    Personal History*

Mr. Barbalat is 42 years old. He was born in the former Soviet Union, now Ukraine. His parents Semeon "Sam" and Vyches "Slava" (Tabacknic) Barbalat have been married for over 45 years, and reside in Fair Lawn, New Jersey. Mr. Barbalat has a sister, Rita Chelney, age 38, who is married with two children and with whom Mr. Barbalat is very close.

Mr. Barbalat was raised in Chisinau, the capital of Molodova. At that time, his father worked as an engineer, and his mother was a kindergarten teacher. The family shared a small one-bedroom apartment. Even as a boy, Mr. Barbalat worked hard to support his family. At one point growing up, his earnings were the only means of support for the entire family. In September 1988, the family immigrated to the United States and lived in Fair Lawn, New Jersey.

3

Although the family immigrated during his early high school years, the transition was relatively smooth for him and he learned English quickly, joined a soccer team, and made friends easily. Following graduation from high school, Mr. Barbalat went on to attend and graduate from Rutgers University with a Bachelors of Science in Industrial and Systems Engineering. He became a naturalized citizen during his junior year of college in 1995.

After graduation, Mr. Barbalat moved to the greater New York City area. Mr. Barbalat worked as a networking engineer, and then later as a technology salesman for several software and telecommunications companies. Working his way up in his career, by 2004, Mr. Barbalat was a global account manager with Nortel Networks, Inc. In 2008, Mr. Barbalat joined Citrix Systems, Inc., a software company with its main offices in Florida, as a sales manager.

Shortly after, following the financial collapse, Mr. Barbalat lost his job with Citrix. In order to support himself, Mr. Barbalat turned to day trading and poker. Eventually, poker became a full-time profession for him.

Notably, about six months prior to his arrest, Mr. Barbalat left the world of high stakes poker games behind, and had been planning on a new career in hotel management in Mexico. After his arrest in April 2013, he began working in August as a sales representative for DIG Enterprises, LLC, a video conferencing company located in Boynton, New Jersey. Although he is grateful for his current employment, he wishes to begin a career in hotel management and pursue a job offer to work as general manager for the Hotel Ahau Tulum located in Cancun, Mexico. *See* Ex. E (offer letter).

### 2.  *Mr. Barbalat's Health*

Mr. Barbalat is in good physical and mental health.

.s. Mr. Barbalat is in excellent physical health and engages in many forms of exercise to lower his anxiety. He continues to progress in his therapy. *See* Ex. C (Dr.          letter).

### 3.     *Commitments to Family, Job & Community*

Letters written by Mr. Barbalat's family and friends attest to a man of high character, for whom the offense charged is an aberration. *See* Ex. B[1]. The one theme that is repeated by both his family and friends is his compassion towards his family, friends, and his community.

Mr. Barbalat's parents describe Mr. Barbalat as responsible, hardworking, and always considerate of his family and friends. They recount how he supported the family before immigrating to the United States. They also describe how he saved money to buy a car within a few months of arriving in the U.S., helping his grandparents with transportation whenever they needed. When his grandfather passed away, his parents describe their son as having immediately taken care of all the funeral arrangements and as having served as a source of strength during a trying time. Mr. Barbalat's parents also describe their son as hardworking and intelligent – noting that he quickly mastered English and excelled in college while making many friends. They describe Mr. Barbalat as someone who is "generous to a fault and [who] cannot bear when someone he cares about is upset or in need of something." Finally, his parents explain how the birth of Mr. Barbalat's daughter,          e, marked a turning point in their son's life:

> His life changed drastically and for the better eleven months ago with the birth of his daughter. He is fully aware that his actions now have an impact not only on him but on his family. As usual, he takes this added responsibility very seriously and, along with Marie, will raise their daughter with the family values that he was raised with.

*See* Ex. B (Mr. and Mrs. Barbalat joint letter).

---

[1] Copies of 13 character letters are arranged in alphabetical order.

Marie Sloupova – Mr. Barbalat's girlfriend, and the mother of their daughter – wrote a heartfelt letter where she describes how he saved her during a time of utter despair. She describes him as "funny, genuine, honest and caring", with the "biggest heart", and notes how because of him, she found the courage to believe in herself. She also describes him as "the most amazing father" who is protective of their daughter, who has already become "a daddy's girl" and whose first word was "dada." *See* Ex. B.

Mr. Barbalat's sister, Rita Chelney, and her husband, Stan Chelney, also submitted letters attesting to Mr. Barbalat's good character and his close connection with his daughter. His sister describes how her older brother always looked out for her, and made sure that his close friends knew her and kept an eye on her. She also describes that even while a freshman at Rutgers, her brother continued to look out for her and made her own transition to college much easier. For Rita, her brother is "generous, kind and pretty funny," and someone who always "knows just the right thing to say to make us laugh." In remarking on the close connection that Mr. Barbalat shares with his daughter:

> You can see the bond they already have, even at her young age just by being in the room with them. She smiles every time he picks her up, and whenever he leaves the room, she searches for him. It's easy to see how much he loves her. Being a father has changed him a bit. He feels the responsibility for another human being, for her wellbeing and for her future.

*See* Ex. B (R. Chelney letter).

Stan Chelney, Mr. Barbalat's brother-in-law, also expresses his support for Mr. Barbalat, describing him as "athletic, gregarious, and always surrounded by friends." Mr. Chelney also notes the profound effect his relationship with his girlfriend and the birth of his daughter has had on his personality – resulting in a growth in his maturity and an increasing emphasis on how his decisions affect his family. *See* Ex. B (S. Chelney letter).

6

Lastly, Mr. Barbalat's first cousin, David Barbalat, describes the difficulties of growing up in the Soviet Union and the great persistence it took to establish a life in the United States. Their families remained close throughout those difficult times. David also remarks regarding how important Mr. Barbalat was to him during a difficult divorce, and describes his compassion and support for his family. *See* Ex. B (D. Barbalat letter).

In addition to his close family, Mr. Barbalat has strong, long-lasting friendships, which are another testament to his good moral character. *See* Ex. B (D. Sender letter) (a friend for over 20 years who describes Mr. Barbalat as always "willing to play the role of a free psychiatrist to a friend in need" and as someone who would "listen and care intently about my happiness because I could tell in his heart that he truly cared if I was happy."). Another close friend describes Mr. Barbalat as an "honest, loyal and [an] upstanding friend and citizen." *See* Ex. B (Y. Hassoun letter).

David Glick describes their long-lasting friendship, and notes that Mr. Barbalat taught him that people from different cultural backgrounds are more similar with each other than they are different. He claims that his friendship with Mr. Barbalat "enabled [him] to become a better friend, husband and father in my own life." He also describes how Mr. Barbalat was quick to help him in a career transition and how Mr. Barbalat's support and loyalty helped lead him to much professional success. *See* Ex. B (D. Glick letter).

In a heartfelt letter, Joseph Nevins depicts Mr. Barbalat's loyalty during a difficult time in his life:

> Will was the main friend that stuck by me and helped guide me to getting my life back on track. He was instrumental in helping me to become a productive member of society. I can't say enough of what a good person Will is – something that I never considered or appreciated when befriending him back in my college days.

*See* Ex. B (J. Nevins letter).

7

Friends Elliot Schreiber, James Anglim, John Nargiso, and Moe Green also wrote on behalf of Mr. Barbalt, with each speaking highly of his compassion, his loyalty to his friends and his remorse for the offense charged. Mr. Schreiber defines him as a "compassionate and a warm hearted individual who has been supporting during great times and hard times." *See* Ex. B. Mr. Anglim writes that Mr. Barbalat helped to pay rent for his apartment when he fell on some difficult times. *See* Ex. B. Mr. Green writes of the friendship that Mr. Barbalat cultivated with his son and how he is a "good friend and a great father." *See* Ex. B. Lastly, Mr. Nargiso speaks to Mr. Barbalat's capacity to admit – and now learn from – his mistakes. *See* Ex. B.

Finally, Mr. Barbalat is also active in his community. He has donated his time and money to organizations that raise funds for orphaned children in New York, and for individuals suffering from spinal injury and paralysis. He has also supported the New York City children's toy drive yearly for the past six years, and donated to PETA. *See* Ex. B, letters by Mr. Hassoun, Mr. Schreiber; *see also* Ex. A (Will Barbalat letter).

In summary, Mr. Barbalat's commitment and bond to his family, community, and friends speaks volumes about the type of person he is and demonstrate that this offense is not indicative of who he really is.

### 4.    *Remorse & Acceptance of Responsibility*

Mr. Barbalat deeply regrets his mistakes. Mr. Barbalat assured this Court that there will not be a repeat of his past offenses, remarking: "I realize that what I did was wrong, and wish to point out that I would never consider doing anything again that would jeopardize my family's future. Marie and my daughter mean everything to me." *See* Ex. A (Will Barbalat letter).

Those closest to Mr. Barbalat have observed his remorse first-hand, and have seen how the current circumstances have affected him. *See* Ex. B (Mr. and Mrs. Barbalat joint letter) ("Will is completely aware that his poor decisions have put him in this situation and for him, letting his family down is the worst thing he could have done."); *see* Ex. B (D. Glick letter) ("I can assure you that he regrets and is sorry for some of the decisions that he has made. While he recognizes that this incident will forever be part of his personal history in a detrimental manner, I know he hopes to have the opportunity to demonstrate that this is not who he truly is"); and *See* Ex. B (S. Cheney letter) (describing how Mr. Barbalat is particularly distraught concerning the effects that his poor choices have had on his family and that he "can see that Will is regretful about the mistakes he has made.").

In an effort to take full responsibility for his actions, Mr. Barbalat entered into a plea agreement with the U.S. Attorney's Office. He was the second defendant to plead guilty, and the first of the defendants charged in his counts. He would have pleaded guilty sooner but for counsel's advice to wait for the Second Circuit's decision in *U.S. v. DiCristina*, 726 F.3d 92 (2d Cir. 2013), which ultimately came down on August 6, 2013, and reversed the district court's holding that poker does not constitute gambling under the Illegal Gambling Business Act. Given Mr. Barbalat's affirmative steps to accept responsibility for his actions, a custodial sentence would be greater than necessary to achieve the purposes of 18 U.S.C. § 3553.

**B.    The Nature & Circumstances of the Offense**

We respectfully request that Mr. Barbalat be sentenced to a term of probation, and submit that such a sentence is supported in his case given the nature and circumstances of the offense.

First, the nature of the offense – running poker games inside of his apartment – is one that would have resulted in a misdemeanor charge under New York state law. Under Article 225.05

of the New York State Penal Law, promoting gambling is a class A misdemeanor. It is this conduct that is the "unlawful activity" that underlies his Travel Act conviction. Although we do not minimize the offense conduct, we note that Mr. Barbalat was charged along with over thirty defendants in a broad ranging indictment involving much more serious allegations against some of his co-defendants, including allegations of organized crime, money laundering, and the use of violence and threats to collect gambling debts. Significantly, the indictment does not make a single allegation that Mr. Barbalat engaged in any of those crimes. It does not allege that Mr. Barbalat's poker business fueled or supported the Russian mob in any way. Indeed, Mr. Barbalat has no ties to any Russian mob, and he has no knowledge regarding those allegations in the indictment against his co-defendants.

Second, Mr. Barbalat operated a poker business for a relatively short period of time, and did so only because of the personal circumstances that he faced, having lost his job when the financial market crashed in 2008. Up until that point, Mr. Barbalat had a long history of good jobs. At issue, is about a two-year period from 2010 through 2012, when Mr. Barbalat held professional poker games in his apartments. At first, the games were small. Then, through another poker player, Mr. Barbalat met Arthur Azen, a co-defendant in this case. Mr. Azen was well known in the poker community and had a strong following of high stakes players. Mr. Barbalat ended up partnering with Mr. Azen for the games where Mr. Azen brought players to Will's apartment. The games then got bigger, and because of the larger following, Mr. Barbalat decided to rent another apartment where he lived on Union Square to hold smaller games. For a number of reasons, including a falling out with Mr. Azen, the stress of managing the games and the apartments, the desire to change his lifestyle, and the arrival of his first child, Mr. Barbalat quit the business before he was indicted in April of 2013. By the time his daughter was born in

10

November 2012, Mr. Barbalat had stopped holding high stakes games, and he and Marie were in the process of looking to move abroad to Mexico, where Mr. Barbalat had an employment offer in the hotel industry through a close friend.

Accordingly, given the nature of the offense, and the circumstances surrounding Mr. Barbalat's relatively short engagement in the offense, a sentence in this case that involves any incarceration and/or home detention would be significantly greater than necessary to achieve the purposes of 18 U.S.C. § 3553.

**C.    The Need to Promote the Purposes of Sentencing**

Section 3553(a) directs the Court to consider the purposes behind sentencing including the need for the sentence to (i) reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense; (ii) to afford adequate deterrence to criminal conduct; (iii) to protect the public from further crimes of the defendant; and (iv) to provide the defendant with needed training, medical care or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a). We submit that the consequences already suffered by Mr. Barbalat have served as ample punishment and deterrence.

*1.    Mr. Barbalat Has Already Been Severely Punished*

Mr. Barbalat has already suffered greatly from his actions. He has a felony conviction that will be on his record forever. More than that, the publicity surrounding his case and all of the co-defendants has tarnished his reputation, and will severely handicap his job prospects with future employers. The punitive effects of the press coverage were significantly exacerbated by the fact that the U.S. Attorney's Office issued a press release following his guilty plea that inaccurately and inappropriately suggested that Mr. Barbalat was linked to organized crime: "With their pleas, we move closer to holding to account all those who participated in this wide-

11

ranging network of criminal conduct linked to organized crime." *See* Ex. D, U.S. Attorney's Office Press Release. There was no allegation in the indictment that Mr. Barbalat has any links to organized crime, and he did not plead guilty to any participation in an allegedly "wide-ranging network of criminal conduct linked to organized crime." *See id.* The press release announced both Mr. Barbalat's plea and that of his co-defendant – Kirill Rapoport – who is not named in either of the two counts alleged against Mr. Barbalat. A Google search of "William Barbalat" results in numerous articles that chronicle the allegations of a purported Russian mob ring that has absolutely nothing to do with Mr. Barbalat. Thus, Mr. Barbalat will have a difficult time getting people to look past the defamatory articles that mention his name. We asked the U.S. Attorney's Office to retract the press release, and our written request was ignored. *See* Ex. D (press release and email dated August 23, 2013).

Thus, in light of the serious consequences that Mr. Barbalat has already suffered – and will continue to suffer – a sentence involving any amount of incarceration would be greater than necessary to achieve the purposes of 18 U.S.C. § 3553.

### 2.   *The Purposes of Deterrence Have Already Been Served*

We also respectfully submit that the needs of deterrence are fully served by a non-custodial sentence. As to individual deterrence, Mr. Barbalat and his family have already suffered so much by virtue of this prosecution, that there is no need for further punishment to assure that he is adequately deterred in the future.

r). Furthermore, as outlined by his parents, Mr. Barbalat has made significant life changes since the birth of his daughter and he deeply regrets letting his family down, and is entirely committed to "staying on the right track in

the future." *See* Ex. B (Mr. and Mrs. Barbalat joint letter). His sister also describes how Mr.

Barbalat feels the responsibility for his daughter and for her well-being and future and how the

entire family is working through this difficult situation by supporting one another and striving to

"get back to things being normal again." *See* Ex. B (R. Chelney letter). Months before he was

indicted, Mr. Barbalat had left the world of high stakes poker behind him. After his arrest, he

was quick to confess before this Court and to express his remorse. Given the support and

scrutiny of his girlfriend, family, friends,                    ., it is inconceivable that Mr. Barbalat

will in any way participate in illegal gambling in the future.

      As to general deterrence, we respectfully submit that the consequences that have befallen

Mr. Barbalat by virtue of his offense – namely, a felony conviction, the $150,000 forfeiture, and

public humiliation – will more than adequately deter others from committing a similar offense.

      Accordingly, the purposes of deterrence have already been served and there is no need to

impose a custodial sentence.

### 3. *There Is No Need to Protect the Public From Mr. Barbalat*

      A sentencing court is also tasked with imposing a sentence that will protect the public

from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(C). As detailed above, Mr. Barbalat

poses no risk of recidivism. He already has a job here in the U.S., and he has a job offer in

Mexico that would provide him and his family with a stable home and source of income. Thus,

there is no reason to believe that he is likely to return to illegal gambling. This is not a situation

in which a sentence of imprisonment is necessary to protect the public from Mr. Barbalat.

### 4. *Continued Counseling is the Most Effective Treatment*

      Finally, a sentencing court must consider the need for the sentence imposed to provide

the defendant with "needed educational or vocational training, medical care, or other correctional

treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The most effective remedy

for Mr. Barbalat's behavior in committing the offense is to allow him to ·

. Thus, a custodial sentence

would not further these purposes.

**D.    Kinds of Sentences Available**

In fashioning a just sentence, Section 3553(a)(3) requires the Court to consider the "kinds

of sentences available." Notably, the Sentencing Commission has found that probation can

satisfy the purposes of sentencing, including providing just punishment for the offense. *See* U.S.

Sentencing Guidelines Manual ch. 5, pt. B, introductory cmt. ("Probation may be used as an

alternative to incarceration, provided that the terms and conditions of probation can be fashioned

so as to meet fully the statutory purposes of sentencing, including promoting respect for law,

providing just punishment for the offense, achieving general deterrence, and protecting the

public from further crimes by the defendant."); *see also Gall v. United States*, 552 U.S. 38, 44

(2007) (a defendant on probation is "subject to several standard conditions that substantially

restrict [his] liberty," and "harsh consequences ... await" he who "violates the conditions of his

probationary term"); *U.S. v. Davis*, 07 Cr. 727 (HB), 2008 WL 2329290, *6 (S.D.N.Y. June 4,

2008) (noting that "the courts and the United States Sentencing Commission have recognized

that probation is both rehabilitative and punitive.").

Additionally, under the Sentencing Guidelines, community service may be ordered as a

condition of probation. U.S. Sentencing Guidelines Manual, § 5F1.3.

**E.**    **The Need to Avoid Unwarranted Sentence Disparities**

Section 3553(a)(6) requires the Court to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records" who have been found guilty "of similar conduct." A sentence of probation would be in line with defendants charged with committing similar acts.

Recently, Your Honor sentenced codefendant Bryan Zuriff to two years of probation, six months home detention, 300 hours of community service, and a $20,000 fine following his guilty plea for engaging in an illegal online sports gambling business in violation of 31 U.S.C. § 5363 and 5366 and 18 U.S.C. § 2. *United States v. Zuriff*, 13 Crim. 268 (November 25, 2013). Like Mr. Barbalat, Mr. Zuriff was subject to a Guidelines range of six to twelve months' imprisonment in Zone B. Unlike Mr. Zuriff, Mr. Barbalat entered the world of illegal gambling in order to support himself financially following the economic crisis and left it after a relatively short period of time, six months prior to his arrest. Also, according to the Government, the bets that Mr. Zuriff booked totaled in the millions of dollars. (Government Sentencing Memorandum, dated November 18, at p.6). To the extent that the magnitude of the offense can be compared by the forfeiture amounts, then it is notable that Mr. Barbalat has agreed to forfeit $150,000.00 compared to the $500,000.00 forfeited by Mr. Zuriff. In light of Mr. Zuriff's sentence, we respectfully submit that a probationary sentence without home detention would be fair and appropriate under the circumstances.

In addition, a series of sentences for a group of defendants involved in illegal gambling operations that economically supported the mob, facts wholly absent in the case of Mr. Barbalat, received probationary sentences without any incarceration or home detention. *See U.S. v. Donnis*, 08-CR-76 (JBW), 2008 WL 6124522, *1 (E.D.N.Y. October 10, 2008) (three years

15

probation where the defendant's bookmaking operation "economically supported the mob"); *U.S. v. Pomponio*, 08-CR-76 (JBW), 2008 WL 4630509, *1 (E.D.N.Y. October 17, 2008) (same); and *U.S. v. Giammarino*, 08-CR-76 (JBW), 2008 WL 5243640, *1 (E.D.N.Y. December 15, 2008) (two years probation).

Mr. Barbalat has an opportunity to pursue a promising career in Mexico. Any amount of home detention will likely result in his having to forfeit that opportunity. *See* Ex. E (offer letter requesting acceptance by March 1, 2014).

### IV. Conclusion

In light of all the circumstances of this case, including Mr. Barbalat's background, family, career, and future, we respectfully request that the Court impose a sentence that is fair and just. We respectfully urge the Court to review all the letters submitted and to take their comments about Will Barbalat to heart and to impose a term of probation without any home confinement.

Thank you for your attention to this matter.

Respectfully,

Silvia L. Serpe

Encl.

Cc: AUSA Joshua Naftalis (unredacted by email)